UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

———————————————————— x

CHRISTINA ANSTETT, on behalf of
herself and all others similarly situated,

   *Plaintiff*,

v.

FERRARA CANDY COMPANY,

   *Defendant*.

———————————————————— x

Case No. _____

**<u>CLASS ACTION COMPLAINT</u>**

DEMAND FOR JURY TRIAL

Plaintiff CHRISTINA ANSTETT ("Plaintiff"), on behalf of herself and all others similarly situated, alleges the following class action complaint (the "action") against Defendant FERRARA CANDY COMPANY (collectively, "Defendant") for violations of state statutes and common law doctrines seeking actual damages, statutory damages, restitution, disgorgement of profit into a constructive trust, pre- and post-judgment interest, and reasonable costs and attorneys' fees upon personal knowledge as to herself and her own actions, and upon information and belief, including the investigation of counsel as follows:

## INTRODUCTION

1.      Defendant, Ferrara Candy Company, is one of the most well-known candy brands in the United States.  Among the candy sold by Defendant includes exceptionally popular candy brands, including Black Forest Gummy Bears, Laffy Taffy, NERDS, Sweet Tarts, Sweet Tarts Ropes, and Trolli gummy candies (the "Products").  Plaintiff, like millions of other Americans, purchases the Products regularly and consumes them herself as well as with her minor child.

2.      Defendant's success in the candy industry is almost unparalleled and unprecedented, including with respect to the Products themselves.  For example, Defendant's NERDS Product, according to Defendant, has had "continued growth and category leadership, with $500 million in annual total sales as of May 22, 2024. Despite NERDS (and the other Products made by Defendant) having bright,

colorful, and cartoonish packaging marketed toward children, the reality is much darker.

3.     According to scientific lab testing by the State of Florida (where Plaintiff lives), Defendant's Products contain toxic amounts of arsenic.[1]  Indeed, according this testing, just a mere consumption of six small, 15-ounce boxes of NERDS Products, for example, exceeds the annual limit of arsenic of what a child, like Plaintiff's child who regularly consumes NERDS, should consume annually. One movie sized box of NERDS candy, according to this testing, exceeds the annual amount of arsenic that a child should consume in a year.

4.     Arsenic is dangerous for consumption.  According to the American Cancer Society, arsenic is a form of steel, grey metal and tends to be both toxic and cancer-causing.  As studied by the International Agency for Research on Cancer (IARC), which is part of the World Health Organization (WHO), arsenic is carcinogenic to humans: causing lung, bladder, skin, kidney, liver, and prostate cancer.  Additionally, the IARC reports that exposure to arsenic above acceptable levels can be fatal, as well as nausea, vomiting, diarrhea, muscle weakness, cramping, skin rashes and increased risk of infections.  Both the FDA and the American Academy of Pediatrics do not recommend any specific limit of arsenic to be consumed by children; the FDA even recommends that infants under certain ages

---

[1] **Ex. A.** – State of Florida Testing of Candy Products for Toxic Levels of Arsenic.

do not consume or drink fruit juice due to the mere possibility of arsenic exposure. Here, the levels of arsenic, in just a few servings, exceed what – if any – arsenic should be consumed not just in one sitting, but in an entire year.

5.  The candy testing initiative is part of a larger attempt by the State of Florida to create "clean and transparent food systems, accountability, and restoring trust in public health through evidence-based action."[2]  According to Florida's First Lady, Casey DeSantis, who is spearheading the effort along with Governor Ron DeSantis and Florida State Surgeon General Dr. Joseph A. Ladapo: "[a]s parents and consumers, we should have confidence that the products sold in grocery stores are safe and free from poison.  No one should have to wonder whether the food that they are feeding their children is quietly impacting their health over time."[3]

6.  Against this backdrop, Plaintiff Anstett, on behalf of herself and all others similarly situated, brings this action seeking actual damages, statutory damages, restitution, disgorgement of profit into a constructive trust, pre- and post-judgment interest, and reasonable costs and attorneys' fees under state statutes and common law doctrines due to Defendant's acute failure to ensure that the Products were: (1) fit and safe for their ordinary purpose which is to be consumed, (2) marketed free from omissions regarding the inclusion of arsenic in the Products.

---

[2] https://www.floridahealth.gov/2026/01/26/icymi-florida-releases-candy-testing-results-under-healthy-florida-first-initiative/, (last accessed Feb. 4, 2026).

[3] *Id.*

7.     As a result of the foregoing, Plaintiff Anstett and Class members (defined below) were harmed by paying a price premium for the Products which they otherwise would not have paid due to the presence of arsenic – or would not have purchased the Products at all.

## JURISDICTION and VENUE

8.     *Subject Matter Jurisdiction.*  This Court has subject matter jurisdiction over this Action pursuant to the Class Action Fairness Act of 2005 ("CAFA") because there are (a) more than 100 members of the proposed classes, (b) some members (including Plaintiff Anstett) of the proposed classes have a different domicile or citizenship from the Defendant, and (c) the claims of the proposed class members exceed $5 million, exclusive of costs and fees.  Specifically, there are thousands of members of the proposed classes – hundreds of millions of dollars worth of Products are sold annually across the country; Plaintiff Anstett is domiciled in Florida while Defendant Ferrara Candy Company is not; and the measure of damages (a price premium paid on every box of the Products during the Class Period) as alleged well exceeds $5 million dollars.

9.     *Personal Jurisdiction.*  This Court has personal jurisdiction over Defendant because: (1) Defendant Ferrara is headquartered in Chicago, Illinois, and (2) Defendant conducts significant business in Illinois such that they purposefully availed themselves of the privilege of doing business in Illinois.

10.   *Venue.*   Venue is proper in this Court because Defendant transacts business within this District and a substantial part of the events giving rise to Plaintiff's claims took place in this District.

## PARTIES

### *Plaintiff Christina Anstett*

11.   Plaintiff Christina Anstett is domiciled in Florida and resides in Collier County, Florida.

12.   On numerous occasions during the Class Period, Plaintiff Anstett purchased the Products.  For example, Plaintiff Anstett buys grape flavored NERDS on an almost weekly basis for consumption by both her and her minor child.

13.   According to the State of Florida, independent testing verifies that there is a toxic level of arsenic present in the Products:

| CANDY | ANNUAL TOXIC LEVEL OF ARSENIC<br><br>(Parts Per Billion) Child/Adult | ARSENIC<br><br>(Parts Per Billion) |
|---|---|---|
| **Black Forest Gummy Bears** | 16 pieces/40 pieces | 370 |
| **Laffy Taffy (Banana)** | 4 pieces/9.6 pieces | 480 |
| **NERDS (Grape)** | 96 pieces/240 pieces | 380 |
| **NERDS (Strawberry)** | 96 pieces/240 pieces | 450 |

| NERDS Gummy Clusters | 24 pieces/60 pieces | 500 |
|---|---|---|
| Sweet Tarts Originals | 48 pieces/120 pieces | 400 |
| Sweet Tarts Ropes | 3 ropes/7.5 ropes | 390 |
| Trolli Sour Brite Crawlers | 12 pieces/30 pieces | 430 |

14.    When Plaintiff Anstett, like the other members of the Class, purchased the Products, which were produced in the same facilities as the other Products at issue, she believed that she was purchasing safe candy consistent with Defendant's implied promise that their Products were safe for consumption. However, this was not the case.

15.    Had Defendant marketed their Products accurately and refrained from making these vital omissions regarding the presence of toxic levels of arsenic in their Products, Plaintiff Anstett would have been aware of this and would not have purchased the Products or would have paid substantially less for them.

### Defendant Ferrara Candy Company

16.    Defendant Ferrero is a Chicago, Illinois-based corporation which produces candy distributed throughout the United States – including the Products at issue.

## **FACTUAL ALLEGATIONS**

### *The Dangers of Ultra-Processed Foods and Toxins*

17.     The very first consciousness of the dangers of unregulated food production in the United States began in earnest in 1906, with Upton Sinclair's release of the novel, *The Jungle*.  Initially, *The Jungle* was intended to address and act as an expose for the harms and harsh conditions of industrialized labor in America – with a particular focus on the immigrant workers in Chicago's meatpacking plants – but it instead had the result of moving Congress to regulate food production.

18.     According to the Library of Congress, Sinclair "witnessed and described the dangerous, unsanitary practices of slaughterhouses and meatpack[ing]," which ignited an uproar across the country.  Quickly, Congress passed the Meat Inspection Act of 1906 which sought, for the first time, to regulate a subset of the "wild-west" of food production.

19.     At the time, Sinclair told *Cosmopolitan* magazine in October 1906 that "I wished to frighten the country by a picture of what its industrial masters were doing to their victims; entirely by chance, I stumbled upon another discovery – what they were doing to the meat-supply of the civilized world.  In other words, I aimed at the public's heart, and by accident I hit it in the stomach."

20.     For the past century, Sinclair's discoveries have reared their head in every corner of the food industry – time and time again.

21.     According to the Johns Hopkins Bloomberg School of Public Health, "more than half of all calories consumed at home by adults in the U.S. come from ultra-processed foods."  Specifically, these foods contain little or no nutritional value.  And, as a result of these cheap, poorly made foods, diabetes and obesity rates have skyrocketed in tandem with linkages to chronic, often-terminal health conditions such as cardiovascular disease and cancer.

22.     Professor Barry Smith, a renowned expert on multisensory experiences related to eating who has worked at many food companies including with Defendant, says that producers of ultra-processed food have, over time, become more interested in making food irresistible to the extent where consumers feel unable to stop eating.

23.     Today, the goal of food producers who make ultra-processed food is not necessarily to make a healthy product – but to pump out as much addictive food as possible to enhance their bottom line.  This means doing the bare minimum (and often failing to) stay complaint with FDA mandated food safety practices and protocols, as well as using a substantial amount of chemicals and potential contaminants to keep the up rates of production.

24.     From farm to table, ultra-processed food producers expose crops to cancer causing toxicants (like pesticides and herbicides) and processed food to hazardous chemicals and biologically dangerous substances when packaging and sanitizing prepared foods.  Furthermore, at an even earlier stage – the production of raw ingredients – metals like lead, arsenic, cadmium and mercury can contaminate water, air and soil because of pollution.  According to Dr. Conrad Choiniere, Ph.D. of the FDA, "[t]he FDA actively monitors the levels of these metals because at high levels they can be toxic and present a unique danger to those who are most vulnerable: our children."

25.     Over time, the prevalence of lead, for example, has actually declined in the general food supply due to the enhanced, data-driven ability of food producers throughout the supply chain to detect and eliminate toxic levels of arsenic in food inputs.  And, while the amount of lead in food has dropped off, the amount of toxic elements still occurs in higher levels where foods are produced in areas exposed to past industrial uses and pollution.

26.     The harms of consuming toxic levels of arsenic reported on by Congress are as follows The risks of exposure to arsenic include "respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."

27.    Congress also has examined and proved that it is possible for food processors to manufacture consumable goods to avoid including lead in their products emphasizing that it is entirely possible that producers of candy products, like Defendant's Products, source their raw materials appropriately so that toxic ingredient levels in finished products do not exceed maximum threshold amounts.

28.    The FDA has declared that "arsenic [is] dangerous, particularly to infants and children.  They have 'no established health benefit' and [can] 'lead to illness, impairment, and in high doses, death.'"

29.    Toxic contaminants find their way into the food supply though a failure to monitor and eliminate them.  The deleterious effects of these toxins are dangerous and harsh, as many are carcinogenic and can lead to other negative health impacts, like neurotoxicity and cardiovascular disease.  And, with respect to food products sold into commerce that contain toxic levels of arsenic are even more unfit for consumption by vulnerable children.  In fact, Defendant should have known to test for arsenic, high profile scientific studies have existed for decades showing that arsenic can contaminate candy.[4]  Failure to remove toxic levels of arsenic from the Products evidences either negligent or intentionally blind conduct – either are unacceptable.

---

[4] See, e.g., https://pubmed.ncbi.nlm.nih.gov/12617618/ (last accessed Feb. 4, 2026).

30.     Indeed, according to a 2021 report by Congress regarding the presence of Heavy Metals in various baby foods: "even low levels of exposure can cause serious and often irreversible damage to brain development.  By way of the report, Congress explains:

> Exposure to toxic heavy metals causes permanent decreases in IQ, diminished future economic productivity and increased risk of future criminal and antisocial behavior in children.  Toxic heavy metals endanger infant neurological development and long-term brain function.

31.     According to Congress: "Baby food manufacturers hold a special position of public trust.  Consumers believe that they would not sell products that are unsafe."  The same holds true for candy products which are marketed to children – like Defendant's Products.

32.     While the work of Upton Sinclair may have had its peak cultural significance during the turn of the 20th century, the same practices related to cost-cutting, failures to monitor, sanitation issues, and exposure to dangerous elements holds true over 100 years after *The Jungle* was published.

### *The Ferrara Candy Juggernaut*

33.     Founded over a century ago in 1908, Defendant is headquartered in Chicago, Illinois.  After starting out from a humble lone bakery in Chicago's Little Italy neighborhood, Defendant has since grown into one of the largest candy manufacturers in the world.



34.     Today, Defendant is a billion-dollar corporation and produces some of the iconic candy brands known in households across the United States:

1.  Atomic Fireball

2.  Black Forest

3.  Boston Baked Beans

4.  Brach's

5.  Jelly Belly

6.  Jujyfruits

7.  Laffy Taffy

8.  Lemonhead

9.  NERDS

10. Now and Later

11. Red Hots

12. Trolli

35.     Each of these candies, amongst others, are produced in manufacturing facilities across the United States.  Defendant also sells nearly all of Nestles' chocolate products, which it purchased the rights for in 2018 in a $2.8 billion transaction.  Defendant's products, including the Products tested by the State of Florida, are essentially capable of being purchased everywhere from grocery stores to movie theatres.  Indeed, few checkout lines at stores across the country do not also sell Defendant's candy products, including the Products at issue.

36.     This level of ubiquitous presence helps Defendant sell candy at unparalleled levels to parents and children across the country.   Indeed, to keep up with demand, Defendant itself states that it produces 800 million pounds of candy annually.

37.     A sophisticated operation such as this gives Defendant all the financial, technological, and practical resources in the world to ensure that the Products they produce, market, and sell are safe and fit for consumption by both parents and children alike.  This element of control requires that Defendant sell the Products with honest advertising – at a bare minimum to accurately include on packaging the substances found in each piece of candy, as well as any applicable and necessary warnings that should follow.

38.    Despite these absence of any representations to the contrary, Defendant produce and distributes Products which are contaminated with toxic levels of arsenic.

39.    Further, the Products are heavily marketed toward children.  With colorful and cartoonish designs and fun product names, Defendant knows that its target demographic for consumption is children.  The packaging on the Products appear as follows:















40.     Beyond a shadow of a doubt, these Products are clearly marketed toward children and being sold to parents for consumption by children, not dissimilar to Plaintiff and her purchase for her minor child.

*Defendant's Products Contain Dangerous and Toxic Levels of Arsenic*

41.     On January 26, 2026, the State of Florida released testing involving the presence of toxic levels of arsenic in children's candy, which is appended to this Complaint.  This report illuminates the extremely high levels of arsenic in candy – so much so that many of the products listed, including Defendant's Products, surpass annual limits for arsenic consumption in just a few servings sizes.

42.     According to the State of Florida, samples were obtained from common retailers to reflect consumer purchasing patterns.  Then, "[s]amples were analyzed using EPA Method 6010D for multi-elemental determination of metals in solid and liquid samples.  The laboratory followed its established quality assurance plan to validate and verify all results."  EPA Method 6010D, according to Conti-Testing Laboratories of Bethel Park, Pennsylvania, "is [the] standardized analytical method used for determining concentration of various trace elements in a range of solid and liquid matrices, including soil, sediment, and waste samples."

43.     This is an incredible level of arsenic that, unlike in other instances of food contamination, far surpasses toxic limits with ease.

21

44.     Ultimately, the testing yielded highly concerning results:

    a.  28 out of 46 candy products tested positively for toxic levels of arsenic;

    b.  8 out of 10 of Defendant's candy products tested positively for toxic levels of arsenic;

    c.  Defendant's Sweet Tarts Ropes exceeded toxic levels of arsenic for an entire year by consuming less than half of a package of the Product

    d.  Defendant's Banana Laffy Taffy exceeded toxic levels of arsenic for an entire year by consuming just four pieces of the Product; and

    e.  Defendant's NERDS Products nearly exceeded toxic levels of arsenic for an entire year just by consuming one movie theatre sized box of the Product.

45.     To date, no recall has been issued – and the largest trade association in the United States for candy product, the National Confectioners Association, denied the allegations as concluded in the State of Florida's report.  The NCA stated "[c]hocolate and candy are safe to eat and can be enjoyed as treats as they have been for centuries."

46.     This response to the State of Florida's testing remains woefully inadequate.

47.     NCA's response fails to acknowledge that Defendant alone had the ability to eliminate the presence of arsenic in its Products, including through the

copious testing that should have been applied to the Products given both Defendant's sophistication as a food corporation and the fact that these Products are marketed toward consumption by children.

48.     NCA's insistence that chocolate and candy are safe to eat – in light of the findings by the State of Florida – is not only false, but offensive.  If the testing is to be believed (and the testing is not refuted by NCA), then the Products contain arsenic which should not be present.

49.     Even Congress has stated that it is entirely possible to weed out the presence of these Toxins from sugar-based candy products – like the Products at issue.  Defendant, however, chooses not to weed out the presence of toxic levels of arsenic.

<u>*Harm to Consumers*</u>

50.     Due to the significant amount of sales of the Products, there are thousands (if not millions) of consumers who have purchased and are continuing to purchase the Products which are produced and sold by the Defendants.

51.     Given the deleterious health impacts and risks of toxicants on child development and on both the health of children and adults, the presence of toxic levels of arsenic in the Products is a material fact to reasonable consumers, including Plaintiff and Class members.

52. The testing conducted and made publicly available by State of Florida put Defendant on notice of the presence of toxic levels of arsenic in the Products as early as January 2026, if not sooner.

53. Furthermore, Defendant knew or should have known of the presence of toxic levels of arsenic in the Products through routine monitoring and testing – and yet, the Products still tested positively for them.

54. There has also been a slew of litigation regarding these types of allegations with respect to other food products – including in baby food, in chocolate products, and other ultra-processed foods.

55. All of this should have put the Defendant on both actual and constructive notice for the need to test for toxic levels of arsenic and to eliminate them to their child-centric Products.

56. Food manufacturers, especially sophisticated ones like Defendants, hold a position of public trust. Consumers, like Plaintiff and Class members, reasonably believe that these Products would not be sold if Defendant had reason to believe that the Products are contaminated with unsafe levels of arsenic. And yet – they continue to be sold to this very day.

57. In light of all of this, had Plaintiff and Class members known that the Products contained (or risked containing) toxic levels of arsenic, they either would

have been unwilling to purchase the Products or would have paid less for the Products.

58. Defendant knew or should have known that Plaintiff and Class members would rely on Defendant's representations to the contrary, to the packaging marketed toward children, and to the relationship between a consumer and a food producer to adequately make consumers aware of this concerning set of facts. The Products' labels are materially deceptive, false and misleading given Defendants' omissions about the presence (or risk) of toxic levels of arsenic as described above.

59. Had Plaintiff and Class members known the truth, they would not have been willing to purchase these Products or would have paid substantially less for them.

60. As such, Plaintiff and Class members were harmed in the form of the monies they paid for the Products which they would not have otherwise paid had they known the truth.

### *Federal Rule of Civil Procedure 9(b) Allegations*

61. Rule 9(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P. 9(b)") provides that "[i]n alleging fraud or a mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, and as detailed both above and below, Plaintiff has satisfied the

requirements of Fed. R. Civ. P. 9(b) by establishing the following elements with sufficient particularity:

62.     <u>WHO</u>:  Defendant made (and continues to make) material omissions of fact in packaging and marketing materials of the Products by omitting the presence (and/or risk) of significant amounts of unsafe levels of arsenic.

63.     <u>WHAT</u>:  Defendant's conduct was and continues to be fraudulent and deceptive because it has the overarching effect of deceiving consumers into believing that the Products do not contain (or risk containing) significant amounts of arsenic, let alone toxic levels.  Defendants omitted this crucial, material fact from packaging and marketing materials with the knowledge that these issues are important to reasonable consumers and impacts consumers' purchasing decisions.

64.     <u>WHEN</u>:  Defendant omitted from the Products' labeling the fact that the Products contain (or risk containing) significant amounts of arsenic, continuing through the present day and during the applicable relevant periods, including at the point of sale.

65.     <u>WHERE</u>:  Defendant's omissions were made on the front labeling and packaging of the Products, in marketing materials, and on Defendants' websites. As discussed in this Complaint, Plaintiff and Class members relied on Defendant's omissions before purchasing the Products.

66. <u>WHY</u>:  Defendant omitted from the Products' labels, packaging and marketing materials the fact that they contain (or risk containing) arsenic for the express purpose of inducing Plaintiff and Class members to purchase the Products at a substantial price premium or more than they would have paid if they had known the truth about the Products.  As such, Plaintiff profited by selling the Products to millions of consumers across the country, including to Plaintiff and Class members.

67. <u>HOW</u>: Defendants omitted from the Products' labeling the fact that they contain (or risk containing) arsenic.

## CLASS ACTION ALLEGATIONS

68. Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23, seeking certification of the proposed classes (collectively, the "Class"):

**Nationwide Class**: All persons within the United States who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

69. Additionally, Plaintiff brings this Action on behalf of the following subclass:

**Florida State Sub-Class**: All persons within the State of Florida who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

70.     Excluded from the proposed Class are Defendants and any such entities in which the Defendant has a controlling interest, the Defendant's agents, employees and legal representatives, any judge or judicial officer to whom this matter is assigned and any member of such judge or judicial officers' staff and immediately family, as well as all resellers of the Products.

71.     *Numerosity.*  The members of the Class are so numerous that joinder would be inefficient and impracticable.   Based upon Defendant's annual sales statistics, there are millions of Class members across the country.

72.     *Commonality.*  There are common questions of law and fact relevant to the Class, and these questions predominate over any questions affecting individual Class members.   These common questions of law and fact include, without limitation:

> i.   Whether Defendant violated state and common law statutes and doctrines;
>
> ii.   Whether Defendant engaged in the conduct as alleged;
>
> iii.   Whether Defendant was unjustly enriched;
>
> iv.   Whether Plaintiff was harmed;
>
> v.   The measure of damages to Plaintiff and Class members; and,
>
> vi.   Whether Plaintiff is entitled to declaratory and injunctive relief.

73.   *Typicality.*   Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed by way of the conduct as alleged herein.  Plaintiff, like all other Class members, was injured by Defendants' uniform conduct.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class members, such that there are no defenses unique to Plaintiff.  The claims of Plaintiff and those of the other Class members arise from the same operative facts and are based on the same legal theories.

74.   *Adequacy of Representation.*   Plaintiff will fairly and adequately represent and protect the interests of the Class members in that she has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.  Plaintiff has retained counsel experienced in class action litigation, and Plaintiff intends to prosecute her action vigorously.

75.   *Superiority of Class Action.*   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial

resources by allowing the Class' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

76.     The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

77.     Adequate notice can be given to Class members directly using information maintained in the parties' records.

78.     *Predominance.*     The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

79.     This proposed class action does not present any unique management difficulties.

## FIRST CAUSE OF ACTION

VIOLATIONS OF CONSUMER PROTECTION LAWS

FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

(ON BEHALF OF THE FLORIDA SUBCLASS)

80.     Plaintiff repeats the allegations in Paragraphs 1-79 as if fully set forth with the same force herein.

81.     For purposes of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Defendant is considered a business and Plaintiff (as well as Class members) are considered consumers.

82.     FDUPTA prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service.

83.     Defendant committed deceptive acts or practices by employing material omissions about the presence (or risk of a presence) of toxic levels of arsenic in the Products.

84.     Information as to the content – and, specifically, the presence of arsenic – in each of their Products was in the exclusive control of Defendant. Plaintiff could not possibly have known that the Products contained arsenic (and the risks that follow) because such information was not available to the public until January 26, 2026, and then was essentially denied by NCA.

85.     Because Plaintiff bought these Products numerous times, Plaintiff has standing to pursue this claim because she has suffered an economic injury due to lost money or property as a result of Defendant's acts or practices.  When Plaintiff purchased the Products, she relied on material omissions and implied warranties that the Products were fit for human consumption and did not contain elevated levels of arsenic.  Plaintiff spent money in the transaction that she otherwise would not have spent had she known the truth about Defendants' Products.

86.     Defendant's conduct was deceptive in a materially misleading way because it violates consumer's reasonable expectations.    Defendants knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – impression through omission of the truth that they were safe to regularly consume.

87.     Defendant knows that this health information about its Products, which are specifically marketed toward children, are material to consumers.  As a result of its deceptive acts and practices, Defendant sold millions of the Products to unsuspecting consumers nationwide, as well as in Florida.

88.     As a direct and proximate result of Defendants' omissions, Plaintiff and Class members were injured in that they: (1) overpaid for the Products that were not what Defendants represented, (2) were deprived of the benefit of the bargain because these Products were different than what was advertised and marketed, and

(3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant had adequately disclosed the presence of toxic amounts of arsenic in them.

89.     On behalf of herself and Class members, Plaintiff seeks to enjoin Defendants' unlawful acts and practices.   On behalf of herself and Class members, Plaintiff also seeks to recover her actual damages or $500.00 in statutory penalties, whichever is greater, three times her actual damages, as well as reasonable attorneys' fees.

## **SECOND CAUSE OF ACTION**

### FRAUDULENT CONCEALMENT

### (ON BEHALF OF THE NATIONWIDE CLASS)

90.     Plaintiff repeats the allegations in Paragraphs 1-79 as if fully set forth with the same force herein.

91.     Plaintiff brings this Count on behalf of all Class members.

92.     Defendant, as a sell of products to Plaintiff and Class members, had a duty to disclose to consumers that the Products contained toxic levels of arsenic.

93.     Instead, Defendant concealed and suppressed material facts regarding the Products, namely the fact that the Products contained toxic levels of arsenic.

94.     Plaintiff and the Class members purchased the Products that contained undisclosed levels of arsenic despite the availability of other candy and alternative products with lower or non-existent levels of arsenic.

95.     Defendant charged, and Plaintiff and Class members paid, a premium price for the Products despite the availability of comparably priced Products with lower or non-existent levels of arsenic, including other candy and alternative products.

96.     Defendant's omissions as alleged induced Plaintiff and the Class to make their purchases of the Products.  Plaintiff was entirely unaware of these material facts, and would have paid less (or would not have purchased at all) the Products for which she paid.

97.     Accordingly, Defendant is liable to Plaintiff and Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution, and/or diminution of value.

98.     Defendant's acts were done wantonly, maliciously, oppressively, deliberately with the intent to defraud, and in reckless disregard of Plaintiff's and other Class members rights in order to enrich itself.  Defendant's conduct as alleged warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which is to be determined at trial.

## THIRD CAUSE OF ACTION

UNJUST ENRICHMENT/QUASI-CONTRACT

(ON BEHALF OF THE NATIONWIDE CLASS)

99.    Plaintiff repeats the allegations in Paragraphs 1-79 as if fully set forth with the same force herein.

100.    Plaintiff and Class members conferred a benefit onto Defendant in the form of gross revenues derived from the sale of the Products as a result of the money paid by Plaintiff and Class members to sellers of the Products.

101.    Defendant was unjustly enriched in retaining these gross revenues derived from Plaintiff and Class members, and retention of such revenues under these circumstances is unjust and inequitable because Defendant omitted that the Products contained (or risked containing) toxic levels of arsenic.

102.    This caused economic injuries to Plaintiff and Class members because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

103.    Defendant accepted and retained the benefit in the amount of gross revenues it derived from sales of the Products to Plaintiff and Class members – and it would be unjust for Defendant to retain these financial benefits – and these profits should be placed into a constructive trust and disgorged to Plaintiff and Class members and restitution should be provided for Plaintiff and Class members.

## **REQUEST FOR RELIEF**

104.   Plaintiff, on her own behalf and on behalf of the Class and the Sub-Class, prays for the following relief:

a.   An order certifying the Class and the Sub-Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as Class and Sub-Class Representative and their attorneys as Class Counsel;

b.   A declaration that Defendant are financially responsible for notifying Class and Sub-Class members of the pendency of this suit;

c.   An order declaring that Defendant's conduct violates the consumer protection statutes cited;

d.   Actual damages;

e.   Statutory damages;

f.   An order providing appropriate equitable relief in the form of an injunction against Defendant's unlawful and deceptive acts and practices, and requiring proper, complete, and accurate representation and labeling of the alleged Products;

g.   Restitution for members of the Class and Sub-Classes to recover Defendant's ill-gotten benefits;

h. A disgorgement of profits earned on the products sold as well as a disgorgement of the profits earned on the premiums charged to the Class and the Sub-Classes;

i. Pre- and post- judgment interest on all amounts awarded;

j. Other injunctive relief as the Court may deem appropriate; and

k. An order awarding Plaintiff and the Class and Sub-Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMAND

105. Plaintiff hereby demands a trial by jury.

DATED: February 4, 2026

Respectfully submitted,

*/s/ Blake Hunter Yagman*

Blake Hunter Yagman
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**
1050 30th Street, N.W.
Georgetown, Washington, D.C. 20007
Tel.: (929)709-1493
*byagman@sshhzlaw.com*

*Attorney for Plaintiff Anstett and the Proposed Class*